**Adam B. Gottlieb**
**Stephan S. Schlegelmilch (***pending pro hac vice***)**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, NE**
**Washington, DC 20549**
**Telephone: (202) 551-8299 (Gottlieb)**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                           :

**SECURITIES AND EXCHANGE COMMISSION,**  :

                                 :    **COMPLAINT**

                       **Plaintiff,**   :

                                 :    **19-CV-** 5296 **(** **)**

    **– against –**                   :

                                 :

**LONGFIN CORP., and**               :

**VENKATA S. MEENAVALLI,**     :    **JURY TRIAL DEMANDED**

                                 :

                    **Defendants.**   :

                                 :

-------------------------------------------------------------------x

      Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission"), for its Complaint against Defendants Longfin Corp. ("Longfin") and Venkata S. Meenavalli ("Meenavalli"), alleges as follows:

**SUMMARY**

      1.     The Defendants in this action engaged in a scheme to obtain a listing on the Nasdaq Stock Market, LLC (the "NASDAQ") after a fraudulent public offering. By the scheme, the Defendants distributed over 400,000 shares—over one-third of the total shares reportedly sold by Longfin in the offering—to insiders and others affiliated with the company to create the false appearance of a public float of bona fide investors that would satisfy NASDAQ listing requirements. In fact, these insiders and affiliates never paid for their shares, and such purported investments did not satisfy NASDAQ criteria. In addition to inflating the number of bona fide investors who

purchased Longfin shares, the Defendants misrepresented to NASDAQ and in Longfin's SEC filings the amount of funds raised in the offering.

2.      To execute the NASDAQ listing scheme, the Defendants obtained a qualification to conduct an offering (*i.e.*, a notice from the SEC that the offering may proceed) under SEC Regulation A [*Regulation A — Conditional Small Issues Exemption, 17 C.F.R. §§ 230.251 – 263*], a set of rules that allow issuers to publicly sell securities under procedures that are less burdensome than those that apply where the sales are registered under Section 5 of the Securities Act of 1933 ("Securities Act") [*15 U.S.C. § 77e*], by misrepresenting its status as a company based in the United States. Longfin was never entitled to use Regulation A to sell *any* shares because it was not a company based in the United States or Canada, as specifically required by the regulation. Contrary to Longfin's claims that it was based in New Jersey and New York, it was never managed or operated in the United States. Instead, Meenavalli placed substantially all of Longfin's management, employees, assets, cash, and records outside the United States.

3.      Therefore, on June 16, 2017, Longfin received a qualification from the SEC for its Regulation A offering by false pretenses. The SEC's qualification was limited to sales of Longfin securities at a price of $5 per share. After the Defendants realized that Longfin would not sell enough shares to meet NASDAQ listing requirements, the company distributed shares to insiders and affiliates to create the false appearance of having a sufficient public float of bona fide investors to proceed with a listing. None of the insiders or affiliates paid for the shares. Therefore, as the result of materially false pretenses, on December 13, 2017, Longfin's Class A shares began publicly trading on the NASDAQ.

4.      Two days later, on or about December 15, 2017, Longfin announced its acquisition of a purported cryptocurrency business named "Ziddu.com" from Meridian Enterprises Pte. Ltd., an entity at least 92%-owned by Meenavalli. Longfin's stock price rose dramatically after Longfin

publicly announced the acquisition in a misleading Form 8-K, even though Ziddu.com itself was worthless. On December 18, 2017, Longfin's stock price rose to a high of $142.82 per share. Around this time and over the following months, insiders and affiliates sold their shares for millions of dollars in profits as a result of the price spike from the Ziddu.com announcement.

5.    During 2017 and 2018, Longfin and Meenavalli also perpetrated a massive accounting fraud by reporting fictitious revenue from commodity transactions. The scheme involved numerous sham, round-trip transactions between Longfin and Meenavalli-controlled entities using phony bills of lading for purported physical commodities. Longfin fraudulently reported over $66 million of fictitious revenue, constituting over 89% of Longfin's total revenue for the year ended December 31, 2017. As a result, Longfin filed a materially false annual report on Form 10-K for the year ended December 31, 2017 and a materially false quarterly report on Form 10-Q for the quarter ended March 31, 2018. Meenavalli signed each of these reports. Longfin and Meenavalli also filed or signed materially false and misleading current reports on Form 8-K involving the Ziddu.com acquisition and Longfin's subsequent demise.

6.    By engaging in the illegal conduct described in this Complaint, the Defendants violated and, unless restrained and enjoined, will continue to violate the antifraud provisions of Sections 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] and Section 10(b) and Rule 10b-5 thereunder of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

7.    Defendant Longfin also violated and, unless restrained and enjoined, will continue to violate the reporting, books-and-records, and internal controls provisions of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)-(B)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

8. Defendant Meenavalli further violated, and unless restrained and enjoined, will continue to violate the internal controls and books-and-records provisions of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]; the lying-to-accountants provision of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]; and the certification provision of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]. Moreover, Meenavalli aided and abetted Longfin's violations and, unless restrained and enjoined, will continue to aid and abet violations of the reporting, books-and-records, and internal controls provisions of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)-(B)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [*15 U.S.C. §§ 77t(b), 77v(a)*] and Sections 21(d)-(e) and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d)-(e), 78aa*].

10. Venue in this district is proper under Section 22(a) of the Securities Act [*15 U.S.C. § 77v(a)*] and Section 27 of the Exchange Act [*15 U.S.C. § 78aa*] because certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York. During relevant times, Longfin purported to operate its principal place of business in the City of New York, and its shares were traded on the NASDAQ, which is located within this district.

11. Defendants made use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business described in this Complaint.

12.     **Longfin Corp.** is a Delaware corporation that, at relevant times, purported to be headquartered in New York, New York and Lyndhurst, New Jersey.  Longfin's Class A common stock was previously registered with the Commission pursuant to Section 12(b) of Exchange Act. Between December 13, 2017 and its voluntary delisting from NASDAQ in May 2018, Longfin's Class A common stock traded on NASDAQ under the symbol "LFIN."  On May 24, 2018, Longfin's Class A common began trading over the counter.  On November 21 and November 27, 2018, Longfin filed Forms 8-K, signed by Meenavalli, announcing that the company had entered into an Assignment for the Benefit of Creditors on November 14, 2018 in New Jersey state court and, as a result, had terminated all of its employees and disbanded its Board of Directors.

13.     **Venkata S. Meenavalli** founded Longfin and was its Chairman and Chief Executive Officer at all relevant times.  Meenavalli individually controls over 20% of Longfin's Class A shares and over 50% of Longfin's total voting equity.  Meenavalli and his wife own approximately 17% of the voting stock of Stampede Capital Limited, a publicly listed company in India that owns approximately 27.6% of the voting stock of Longfin.  Meenavalli is the Chairman and founder of Stampede Capital Limited.  Meenavalli currently resides in India.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

14.     **Andy Altahawi**, age 54, is a resident of Sunny Isles Beach, Florida.  He is the president of Adamson Brothers Corp., which operates ipoflow.com, a website purporting to be "a leading equity Reg A+ offerings platform opening up the IPO access to everyone."  Altahawi sought to register Adamson Brothers as a broker-dealer in early 2018 and later withdrew the application. Altahawi was previously associated with a number of broker-dealers registered with the SEC,

including during the period July 27, 2017 through December 1, 2017. Altahawi is a defendant in *SEC v. Longfin Corp., et al.*, No. 18-cv-02977-DLC (S.D.N.Y. filed April 6, 2018).

15. **Stampede Capital Limited** ("Stampede") is a publicly listed company in India whose voting stock is approximately 17%-owned by Meenavalli and his wife. Stampede is one of the largest shareholders of Longfin with ownership of 27.5 million shares, representing approximately 27.6% of Longfin's total shares outstanding.

16. **Stampede Tradex Pte. Ltd.** ("Stampede Tradex") was incorporated in the Republic of Singapore and became a subsidiary of Longfin on June 19, 2017 after an acquisition by Longfin. Stampede Tradex subsequently changed its name to Longfin Tradex Pte. Ltd.

17. **Suresh Tammineedi** ("Tammineedi") is a citizen of India residing in Hyderabad, India. Tammineedi is affiliated with Meenavalli through several entities, including as a director of Stampede Capital Limited, which owns approximately 27.6% of the outstanding shares of Longfin. Tammineedi and Meenavalli have been involved as directors of several other entities, including Kling Enterprises India Ltd. and SpaceNet Enterprises India Ltd. Tammineedi is a defendant in *SEC v. Longfin Corp., et al.*, No. 18-cv-02977-DLC (S.D.N.Y. filed April 6, 2018).

18. **Dorababu Penumarthi** ("Penumarthi") is a citizen and resident of the United Kingdom. Penumarthi is affiliated with Meenavalli through Smartahead Solutions Limited, a United Kingdom-based entity, for which Penumarthi and Meenavalli serve as directors. Penumarthi is a defendant in *SEC v. Longfin Corp., et al.*, No. 18-cv-02977-DLC (S.D.N.Y. filed April 6, 2018).

## BACKGROUND ON REGISTRATION OF SECURITIES TRANSACTIONS

19. Under Section 5 of the Securities Act, a company (an "issuer") or any other person selling stock may only do so if it (1) registers the transaction with the SEC pursuant to a valid registration statement that applies to that specific offering of stock or (2) sells the stock in a transaction that is specifically exempt from the registration requirements of Section 5. Section 5

applies to both the issuer and its "affiliates," which are generally persons that the issuer controls, that control the issuer, or that are under common control with the issuer.

20.     To prevent an issuer and its affiliates from circumventing the registration requirements, stock acquired directly from the issuer or indirectly through another affiliate is restricted and generally cannot be sold without registration. To evidence this, the stock certificate usually carries a restrictive legend that prohibits the stock from being further sold to the public unless and until the registration requirements of Section 5 are met or the sale is otherwise exempt. A "transfer agent," a person with specific responsibilities under the Exchange Act, which include issuing securities to bona fide shareholders at the direction of the issuer, may remove the restrictive legend when presented with evidence that the stock is no longer restricted. Once the stock is no longer restricted, it may be sold to the public without further registration.

21.     Section 4(a)(1) of the Securities Act [*15 U.S.C. § 77d(a)(1)*] provides an exemption from registration for transactions "by any person other than an issuer, underwriter, or dealer." An "underwriter," as defined in Section 2(a)(11) of the Securities Act [*15 U.S.C. § 77b(a)(11)*], includes any person who (1) purchases a security from an issuer with a view to distribution of the security or (2) who directly or indirectly participates in that distribution.

22.     SEC Rule 144 [*17 C.F.R. § 230.144*] provides a safe harbor for the sale of securities under the Section 4(a)(1) exemption. A person who satisfies Rule 144's applicable requirements is deemed not to be an "underwriter" in determining whether the Section 4(a)(1) exemption for the sale otherwise applies. Rule 144 contains different rules for affiliates and non-affiliates of the issuer.

> (a)     If a person is an affiliate of the issuer or was an affiliate of the issuer within the previous 90 days, then the person must not sell securities of the issuer, whether or not those securities are restricted, if the issuer (1) has been subject to periodic reporting requirements under Section 13 or 15(d) of the

Exchange Act [*15 U.S.C. §§ 78m, 78o(d)*] for at least 90 days immediately before the sale; and (2) is non-compliant with those requirements at the time of sale. Moreover, if the issuer has <u>not</u> been subject to periodic reporting requirements for at least 90 days before the sale, then the person must not sell securities of the issuer, whether or not they are restricted, unless there is certain public information available about the issuer, including, but not limited to, the issuer's most recent balance sheet, profit and loss, and retained earnings statements and similar information for the prior two fiscal years of the issuer's existence.

(b)     If a person is not an affiliate of the issuer, the issuer has been subject to periodic reporting requirements for at least 90 days before the sale, and the issuer is not compliant with those requirements, then the person must not sell restricted securities of an issuer unless at least one year has passed since the person acquired the securities from the issuer or an affiliate. A one-year holding period also applies to restricted securities held by such person if the issuer has not been subject to periodic reporting requirements for at least 90 days before the sale.

23.     An offering by a qualifying issuer pursuant to SEC Regulation A is exempt from Section 5 registration. On March 25, 2015, the Commission amended Regulation A pursuant to Section 401 of the Jumpstart Our Business Startups (JOBS) Act of 2012 [*15 U.S.C. § 77c(b)(2)-(5)*]. Section 401 directed the SEC to adopt rules expanding the previous Regulation A by, among other things, exempting public offerings of up to $50 million annually (Regulation A, as amended, is commonly known as "Regulation A+" or "Reg. A+").

24.     Under Regulation A, issuers must comply with different regulatory requirements depending on whether the offering is a Tier 1 offering for up to $20 million in proceeds or a Tier 2 offering for up to $50 million.  In either case, no sale of a security may occur under Regulation A until (1) the issuer has filed an offering statement on Form 1-A with the Commission and (2) the Commission has issued a notice of qualification.  Assuming all requirements of Regulation A are satisfied, purchasers in the Regulation A offering acquire unrestricted securities that may be resold without further registration.

25.     In December 2017, Longfin completed a Tier 2 offering under Regulation A for up to 10,000,000 of Longfin's Class A shares at a price of $5 per share.  Over the course of the offering, which was first qualified in June 2017, Longfin issued a total of 1,140,989 shares purportedly sold pursuant to the Regulation A exemption.  Longfin has never registered the offer or sale of any security to the public under the Securities Act.

26.     The Regulation A exemption for Longfin qualified by the SEC only allowed *sales* of Longfin shares at $5 per share.  In other words, if, for example, Longfin as transferor issued shares to a transferee-shareholder for no value, that transferee, unless another exemption from registration applied, would hold restricted shares.  Regulation A does not extend to transfers of securities outside the scope of the qualification granted by the SEC.

27.     Nasdaq Capital Market listing standards required, among other things, that at least 1 million of Longfin's shares be held by unaffiliated, public shareholders with a market value of at least $5 million.  Therefore, for Longfin to obtain a NASDAQ listing, the company had to sell 1 million shares at the price of $5 per share pursuant to its Regulation A offering.

## STATEMENT OF FACTS

*Longfin Fraudulently Obtains SEC Qualification of Its Regulation A Offering*

28.     On February 1, 2017, Meenavalli arranged to incorporate Longfin in the State of Delaware.  He did not transfer significant operating assets to the company.  As of February 28, 2017, Longfin remained little more than a corporate shell:  it had total assets of $298,861, consisting almost entirely of trade receivables; total liabilities of $293,827, consisting almost entirely of trade payables; no fixed assets; and cash of $75.

29.     Although incorporated in Delaware, Longfin was never managed from the United States.  Instead, Meenavalli, a resident of India, managed the company from his residence in India and placed nearly all of the company's assets, cash, and operations in Singapore.  Meenavalli planned to use Longfin's corporate existence in Delaware to effectively sell shares in foreign enterprises in direct violation of Regulation A.

30.     Meenavalli knew that Longfin did not qualify for any exemption under Regulation A because the company was not based in the United States or Canada, as expressly required by the regulation.

31.     On May 12, 107, Longfin filed with the SEC an amended offering statement on Form 1-A, which Meenavalli signed.  The Form 1-A falsely claimed that "LongFin Corp. is currently strategically operating its business operations via direct control and coordination from its principal place of business in the state of New Jersey by the Director and Chief Executive Officer, Mr. Venkata S Meenavalli, the director/ Global Head Executive Officer, [Y.P.] and Chief Financial Officer, [K.S.]."  In fact, as Meenavalli knew or recklessly disregarded, he never managed Longfin from New Jersey, nor from anywhere in the United States or Canada.

32.     On or about April 18, 2017, Longfin and Meenavalli knowingly caused false representations about Longfin's purported operations in New Jersey to be made to the SEC staff in the Division of Corporation Finance.

33.     As a result of the above misrepresentations, on June 16, 2017, Longfin received its first notice of qualification from the SEC under Regulation A to sell up to 10 million Class A shares at a price of $5 per share, based on the company's previously filed offering statement on Form 1-A.

*The Defendants Prepare to List Longfin Securities on the NASDAQ*

34.     On June 19, 2017, Longfin completed an acquisition of Stampede Tradex, a subsidiary of Stampede. Stampede Tradex purportedly operated an electronic platform for trading commodities and securities. Longfin described Stampede Tradex as a "global trade finance technology solution provider." After the acquisition, Longfin recorded an increase to its net assets of more than $16 million. Stampede Tradex had no operations in the United States or Canada.

35.     On October 4, 2017, Longfin disclosed in a post-qualification offering circular filed with the SEC and signed by Meenavalli that the company had applied to list its common stock on the Nasdaq Capital Market under the symbol "LFIN." As disclosed in the offering circular, Longfin needed to raise offering proceeds of $5 million (one million shares at a price of $5 per share) to meet NASDAQ listing requirements.

36.     In the offering circular, Longfin and Meenavalli repeated the false claim that Longfin operated principally in the United States. The offering circular falsely stated, "LongFin Corp., is currently strategically operating its business operation via direct control and coordination from its principal place of business in the City and the state of New York by the Director and Chief Executive Officer, Mr. Venkata S. Meenavalli, the director/ Global Head Executive Officer, [Y.P.] and Chief Financial Officer, [K.S.]." Meenavalli knew this statement was materially false and misleading.

37.     In fact, as Meenavalli knew, since June 2017, Longfin's presence in the United States consisted of an office rented from WeWork, a provider of shared office space, which was staffed by a single 23-year-old individual.

38.     On October 11, 2017, Longfin received a second notice of qualification from the SEC based on an amended Form 1-A. Before receiving this second notice of qualification, Longfin and Meenavalli failed to correct prior misrepresentations about its principal place of business. The second notice of qualification again allowed for the sale of up to 10 million Class A shares at a price of $5 per share.

39.     On November 22, 2017, following additional amendments to Longfin's offering statement, the SEC issued a third notice of qualification to Longfin for 10 million Class A shares at a price of $5 per share. Before receiving this third notice of qualification, Longfin and Meenavalli failed to correct prior misrepresentations about its principal place of business. On the same day, Longfin registered its shares with the SEC under Section 12(b) of the Exchange Act, with such registration effective on November 24, 2017 as a precondition to trading on the NASDAQ.

*The Defendants Execute a Fraudulent Scheme to Meet NASDAQ Listing Requirements and Conceal the Departure of Longfin's Chief Financial Officer*

40.     By early December 2017, Longfin and Meenavalli knew that Longfin would not sell the one million shares at $5 per share, as required for a NASDAQ listing. Longfin's underwriter (the "Underwriter") notified them that Longfin had sold only 590,804 shares. The Underwriter further requested confirmation that Longfin had "received 350k from these investors to count towards the 5mm offering."

41.     Within two days after the Underwriter informed Longfin and Meenavalli of the shortfall in the number of shares sold, Longfin and Meenavalli executed a scheme to distribute hundreds of thousands of shares to company insiders and affiliates to meet the one-million-share threshold.

42. On December 6, 2017, two days before Longfin's offering closed, Longfin and Meenavalli knowingly or recklessly caused Longfin's transfer agent to issue 409,360 shares (the "December 6 Shares") to 24 individuals (the "December 6 Shareholders"). On December 6, 2017, the following communications took place:

(a) At 3:19 p.m., Altahawi emailed Longfin's transfer agent, copying Meenavalli, asking for a telephone call because Altahawi needed to submit 24 subscriptions that day.

(b) At 3:33 p.m., Altahawi sent the transfer agent subscription agreements for 11 individuals.

(c) At 4:09 p.m., Altahawi sent the transfer agent subscription agreements for an additional 13 individuals.

(d) At 4:30 p.m., Altahawi sent the transfer agent a spreadsheet listing the December 6 Shareholders and the shares to be issued to each, which shareholders included Longfin's Chief Financial Officer, V.K.R.; a director of Longfin; two affiliates of Longfin; Penumarthi and Tammineedi; and other directors or employees of parties associated with Longfin and Meenavalli, including Stampede Capital and Stampede Enterprises India.

(e) At 6:31 p.m., a representative of the transfer agent stated in an email to Altahawi, "I have completed the issuance request for you and the statements are attached. Can you please review and advise if we are approved to send statements to the shareholders." The representative attached account statements for the December 6 Shareholders showing the Longfin restricted share issuances.

(f)     At 7:08 pm, at Altahawi's direction, the transfer agent sent out customer statements reflecting the share transfer, but with the shares no longer marked as restricted.

(g)     At 7:40 p.m., Altahawi sent an email to a NASDAQ representative, with a copy to Meenavalli, stating that Longfin would close the offering on the next day and requesting a bell-ringing ceremony for December 13, 2017.

43.     Longfin and Meenavalli knew or recklessly disregarded that the list of December 6 Shareholders provided to the transfer agent included insiders and affiliates who had not paid for their shares and that such share issuances could not be included in the minimum public float required to meet NASDAQ's listing criteria.

44.     The records for the Longfin's escrow accounts and bank accounts, which are controlled by Meenavalli, show that none of the December 6 Shareholders paid for the shares.  In addition, Meenavalli and Altahawi knew that the offering subscription agreements (signed by Meenavalli and distributed by Altahawi) required the shareholders submit payment for the shares in escrow accounts held by Longfin's transfer agents, but that this requirement was not followed by these shareholders.

45.     Meenavalli and Altahawi also knew that several (if not all) of the shareholders were company insiders and affiliates of Meenavalli.  For example, Emmanuel Dasi, one of the December 6 shareholders, was Longfin's Chief Investment Officer and a director of Stampede Enterprises, an entity controlled Meenavalli.  Tammineedi and Penumarthi, affiliates of Meenavalli, received 30,000 and 40,000 shares of Longfin, respectively, as part of the December 6 issuance.

46.     On December 8, 2017, Longfin closed its Regulation A offering.

47.     On December 11, 2017, Altahawi, acting on behalf of Longfin and Meenavalli and with their knowledge and consent, falsely reported to NASDAQ that Longfin had sold a total of

1,140,989 shares at $5 per share in the offering. Altahawi represented that (*i*) Longfin had sold 1,140,989 shares in the Regulation A offering at $5 per share; (*ii*) the total number of shares outstanding after closing was 44,040,898; and (*iii*) there were 364 shareholders in total, each holding at least 100 shares. Altahawi also sent NASDAQ a final list of shareholders, their addresses, and the quantity of shares each held in book entry. In fact, as Longfin and Meenavalli knew or recklessly disregarded, the December 6 Shareholders had not purchased their shares, nor had Longfin sold such shares, because none of the purported shareholders actually made payment to Longfin. Indeed, Longfin transferred the shares for no consideration for the purpose of circumventing NASDAQ's listing requirements. The December 6 Shareholders included insiders and affiliates included Tammineedi, who received 30,000 shares; Penumarthi, who received 40,000 shares; and E.D., Longfin's Chief Investment Officer and a Stampede director, who received 20,000 shares.

48.     The December 6 Shares should have remained restricted in the hands of the December 6 Shareholders. The share transfers were unregistered distributions outside the Regulation A offering qualified by the SEC. These shares were not eligible to be included in the calculation of the public float or the market value of publicly held shares for NASDAQ listing purposes. Nevertheless, Longfin and Meenavalli knowingly or recklessly caused the transfer agent to issue shares to the December 6 Shareholders without restrictive legends.

49.     During the NASDAQ listing process, Longfin and Meenavalli also concealed from NASDAQ the resignation of the company's CFO. Longfin was required to update NASDAQ on any material changes to disclosures made in its listing application, including changes to management and the number of shares sold in the offering. Longfin's CFO, K.S., effectively resigned no later than November 29, 2017, when he was no longer working for the company.

50.     On and before December 13, 2017, the first day of trading, each of Longfin and Meenavalli failed to disclose to NASDAQ representatives that K.S. had resigned from Longfin.

They did not disclose the resignation until the filing of a Form 8-K on December 15, 2017, in which the Longfin stated that its board it had accepted the resignations of both K.S. and the Chief Operating Officer.

*Ziddu.com Announcement Allows Insiders to Reap Millions*

51.     On December 13, 2017, Longfin's Class A shares started trading on the NASDAQ under the symbol "LFIN." The shares opened at $6.94 per share and closed at $5.17 per share, on a trading volume of 297,400 shares.

52.     Longfin's fraudulent NASDAQ listing allowed Longfin insiders, including Altahawi, Tammineedi, and Penumarthi, to sell their positions in the open market in the days immediately following the commencement of trading on the NASDAQ. These insiders reaped millions of dollars in profits as a result of a sharp increase in Longfin's share price as a result of Longfin's and Meenavalli's exploitation of recent developments in cryptocurrency.

53.     On December 14, 2017, Longfin's shares closed at a price of $5.39 per share on a trading volume of 185,386 shares. In other words, after the second day of trading, Longfin's stock price remained within 8% of its Regulation A offering price of $5 per share.

54.     On or about December 15, 2017, Longfin issued a press release announcing that, on December 11, 2017, it had acquired Ziddu.com. According to Longfin, Ziddu.com was a "blockchain-empowered solutions provider" that "offers Microfinance Lending against Collateralized Warehouse Receipts in the shape of Ziddu coins." Longfin acquired Ziddu.com from Meridian Enterprises Pte. Ltd., an entity at least 92%-owned by Meenavalli.

55.     In fact, Ziddu.com provided no services at all. Longfin assigned a carrying value of zero to the website in its accounting records. Ziddu.com produced no revenue, and Longfin did not acquire any physical facilities, employees, market distribution systems, or production techniques. By the acquisition, Longfin acquired merely the rights to use the Ziddu website and trade name.

56. On December 15, 2017, Longfin filed a current report on Form 8-K with the Commission (Form 8-K is a form used to report significant corporate events). The Form 8-K, signed by Meenavalli, attached a press release dated December 14, 2017 announcing the Ziddu.com acquisition. According to the press release, Ziddu's "warehouse financing leverages blockchain technology to finance through Ziddu coins and other cryptocurrencies such as Ethereum and Bitcoin against their collateralized warehouse receipts." The press release quoted Meenavalli, who touted the promise of blockchain technology, in general, while providing few specifics about Ziddu's actual business: "The advent of Blockchain technology has caught the imagination of the global financial services industry; blockchain is emerging as a technological revolution that is set to disrupt the financial services infrastructure. Cryptocurrencies such as Bitcoin and Ethereum will act as a global financing currency to avail credit against hard currencies of many emerging markets."

57. After the filing of Longfin's Form 8-K on December 15, 2017, Longfin's share price and trading volume rose sharply. Longfin's stock price opened at $9.76 per share and closed at $22.01 per share, up four-fold from the previous day's closing price of $5.39.

58. Longfin and Meenavalli did not disclose Longfin's intent to acquire Ziddu.com, even though the acquisition was approved by Longfin's board of directors on December 10 and closed on December 11.

59. On December 18, 2017, the next trading day, Longfin's stock price rose during trading to a high of $142.82 per share, which was an increase of more than 548% from the prior day's closing price and approximately 2,662% above Longfin's closing price on its first day of trading just three days earlier.

60. From December 2017 through March 2018, as alleged in the civil action *SEC v. Longfin, et al.*, No. 18-cv-02977-DLC (S.D.N.Y. filed April 6, 2018), Altahawi, Penumarthi, and Tammineedi illegally sold Longfin shares for trading profits of over $28 million.

61.     On January 2, 2018, Meenavalli wrote a letter to the Underwriter in which he falsely stated, in response to request about whether the December 6 Shareholders had paid for their shares, that the December 6 Shareholders had paid for them by transferring funds into Longfin's "corporate accounts." In fact, the December 6 Shareholders did not remit payment for their shares to Longfin's corporate bank accounts, which Meenavalli controlled. Meenavalli knew or recklessly disregarded that his statement to the Underwriter was materially false and misleading.

62.     During the audit of Longfin's financial statements for the year ended December 31, 2017, Longfin's auditor sought confirmation that the company had received $5.7 million in offering proceeds from the Regulation A offering. Longfin and Meenavalli falsely represented to the auditor that approximately $2,045,607 in wire transfers from Stampede Enterprises represented investor funds from the offering. In fact, these purported payments were not shareholder investments. Indeed, Longfin had already recorded approximately $1,201,502 of these wire transfers as revenue from purported commodity sales. Furthermore, two additional wire transfers totaling $365,920 and received from Stampede Enterprises were repaid by Longfin within days.

63.     On April 2, 2018, Longfin filed an annual report on Form 10-K with the SEC for the year ended December 31, 2017. Meenavalli signed the Form 10-K, which repeated the misrepresentation that Longfin had sold 1,140,989 shares at $5 per share in its Regulation A offering. Meenavalli knew or recklessly disregarded that this statement was materially false and misleading.

*Defendants Longfin and Meenavalli Report Fictitious Revenue from Purported Commodity Transactions*

64.     Longfin and Meenavalli orchestrated a massive revenue recognition scheme that involved fictitious purchases and sales of bills of lading for the shipment of valuable physical commodities. Longfin, however, never held title or ownership interest in any of the commodity transactions for which it recognized revenue. Longfin used several deceptive means to make these

transactions appear legitimate by including in its books and records forged contracts and phony bills of lading. Longfin also recorded round-trip transactions between Longfin and Meenavalli-controlled entities to create the illusion of revenue-generating transactions. As a result of the scheme, Longfin falsely recorded and publicly disclosed approximately $66.6 million in revenue from phony or round-trip commodity transactions.

65.     Longfin's 2017 Form 10-K reported that its primary source of revenue was from "structured trade finance," which comprised "principally the sale of physical commodities." Longfin reported revenues of $66.6 million from sales of physical commodities, which was over 89% of total revenues for 2017 reported by Longfin.

66.     Longfin purported to recognize revenue by acquiring and reselling negotiable bills of lading. The underlying commodities represented in the bills of lading included PCI coal (metallurgical coal used in steel manufacturing), copper cathodes, zinc concentrates, nickel briquettes, and palm oil. Longfin falsely disclosed in its 2017 Form 10-K that, "With respect to our physical commodity contracts, we [Longfin] act as a principal and take title of the physical commodities and assume the risks and rewards of ownership." In fact, as Meenavalli knew or recklessly disregarded, Longfin never owned these commodities.

67.     In addition, in the 2017 Form 10-K, Longfin falsely reported $36.8 million in accounts receivable from counterparties in purported physical commodity sales, which represented approximately 84% of Longfin's total current assets.

68.     Longfin's series of purported transactions from December 6, 2017 through December 13, 2017 with one supposed counterparty ("Counterparty") for PCI coal is an example of Longfin and Meenavalli's scheme. These sham transactions were the basis for approximately $13.3 million in purported revenue for 2017, *i.e.*, over 20% of all revenue for the year. The fraudulent transactions proceeded as follows:

(a)     On December 6, Longfin purported to purchase the coal for $6.15 million through five purchase transactions.

(b)     On December 7, Longfin purportedly sold the PCI coal to an entity named S.A. Global through five sales transactions and recorded $6.5 million in revenue.

(c)     On December 8, Longfin purportedly repurchased 51,576 metric tons of PCI coal from S.A. Global for $6.4 million.

(d)     On December 13, Longfin purportedly sold the PCI coal back to Counterparty and recorded $6.8 million in revenue.

69.     The PCI coal transactions were shams that served no economic purpose.  Longfin and Counterparty exchanged no funds for these transactions.  Longfin simply netted the fictitious purchases and sales.  As of December 31, 2017, Longfin's accounting records showed $13.44 million in accounts receivable from Counterparty and $3.47 million in accounts payable to S.A. Global.  According to Longfin and Meenavalli, Counterparty and S.A. Global were Longfin's largest counterparties in 2017 for commodity sales.  In fact, as Meenavalli knew or recklessly disregarded, Longfin was not a party to any purchase or sale of PCI coal on the purported days of the transactions.

70.     In short, the December 6 through December 13 PCI coal transactions were a sham. For example,

(a)     The transactions were not supported by an actual bill of lading.  The bill of lading was purportedly issued by the ship "MV Salt Lake City" on December 13, the same date on which the original shipper would have had to sell the coal to S.A. Global, who then sold it to Longfin, who then sold it to Counterparty, all transactions occurring on the exact same day.

(b)     The shipper identified on the bill of lading ("Shipper") sold the PCI coal to the notify party listed on the bill of lading, a steel company based in India ("Purchaser").  The transaction did not involve any intervening parties, and the Shipper obtained payment for the PCI coal by negotiating the bill of lading with the bank that issued a letter of credit pursuant to the terms of the purchase and sale agreement between the parties.

(c)     Shipper obtained payment for the shipment and had no economic reason to forego its guaranteed right of payment through the letter of credit and sell the bill of lading "on credit" to Longfin or any intervening party, such as Counterparty.

71.     Longfin's 2017 Form 10-K was therefore materially false and misleading because it reported revenue from these fictitious transactions.  Reasonable investors would have considered it important to their investment decisions to know that Longfin was falsely reporting revenue.

72.     Longfin forged documentation of other purported commodity sales to report additional fictitious revenue.  For example,

(a)     Longfin fraudulently reported approximately $6 million in revenue for 2017 from fictitious commodities contracts containing the forged signature of Y.P.

(b)     Longfin used the same bills of lading for multiple purported contracts.  For example, the same bill of lading supported contracts for PCI coal on December 6, 2017 and April 19, 2018.  The date of the bill of lading was noticeably altered for the second contract to a date of April 6, 2018.  Moreover, for the second purported contract, the ship purportedly transporting Longfin's coal was not in fact in the stated location on April 6,

2018 and could not have transported the coal in the manner represented in the documents.

73.     Meenavalli knew or recklessly disregarded that Longfin's recorded revenue from these transactions was false and misleading.

74.     Meenavalli is the controlling shareholder and CEO of Longfin as well as an officer or control person of the numerous companies that engaged in the sham transactions with Longfin. These include, Meridian Enterprises Pte. Ltd., Meridian Tech. HK Ltd., Stampede Enterprises, and Source Media. Moreover, as bank records reflect, the accounts associated with Longfin and these related entities are controlled by Meenavalli, who is a signatory on the bank accounts.

75.     As one of many examples, Meenavalli signed several contracts and invoices for Meridian Enterprises and Meridian Tech HK in his capacity of as an officer of these companies, which were used for sham commodities transactions that created bogus revenues for Longfin. Accordingly, Meenavalli controlled both sides of these transactions—as the CEO of Longfin and as officers of these counterparties—and inserted Longfin in the middle for purposes of carrying out the revenue recognition scheme.

76.     Longfin also recognized revenue on several fictitious, round-trip transactions between Meenavalli-controlled entities. For example,

(a)     Between May and December 2017, Longfin purported to buy $6.049 million of commodities from Meridian Enterprises, Smartahead Solutions Ltd, and Stampede Enterprises India only to immediately sell those commodities back to Meridian Tech HK, Stampede Enterprises India, and Smartahead Solutions. The contracts were all signed by affiliates of Meenavalli, including Tammineedi and Penumarthi, or contained the forged signature of Y.P.

(b)     In June 2017, Longfin purportedly purchased copper cathodes from

Meridian Enterprises and simultaneously sold the copper to Meridian Tech

HK.  Meenavalli signed the sales agreement for both entities, and Y.P.'s

forged signature appeared in the contracts on behalf of Longfin.

77.     Meenavalli further concealed the revenue recognition scheme by false and misleading

misrepresentations to Longfin's auditor.  In a management representation letter dated April 2, 2018,

Meenavalli falsely stated that Longfin's 2017 financial statements were "fairly presented in

conformity with U.S. generally accepted accounting principles, and include all disclosures necessary

for such fair presentation."  Meenavalli also falsely added that (i) Longfin had made available to the

auditor all financial records and related data, including the names of all related parties and all

relationships and transactions with related parties; (ii) there were no material transactions that had

not been properly recorded in the accounting records underlying the financial statements; and

(iii) Longfin had no knowledge of any fraud or suspected fraud affecting the Company.  As

discussed above, Meenavalli knew or recklessly disregarded that these representations were false.

78.     With respect to Longfin's purported commodities, in an email dated March 28, 2018,

Meenavalli represented to the auditor that "Structured Trade finance [through commodities

transactions] contributed nearly 89% of the total revenue" of Longfin.  In the same email, he

represented that "We pay the supplier at sight and sell to buyer on credit" and included a listed of

purported buyers, including SA Global, Meridian, and Counterparty, among several other

companies.  Longfin did not, however, pay its counterparty "at sight" for the PCI coal transactions.

Further, as Meenavalli knew, but did not disclose to the auditor, in many instances the

counterparties were companies he controlled.

79.     In another email also dated March 28, Meenavalli represented to Longfin's auditor

that: "Longfin receive[d] advance from its customers against the sale of commodity and the same is

kept as a deposit with banker at an interest rate of between 7% - 7.6%. Banker will arrange buyers credit/Letter of Credit for 180 days by keeping 100% security in US dollars at cheaper rate of Libor+50 basis points. After availing buyers credit, Longfin pays to the seller. Longfin makes a margin of around 1%-2% in each trade." No counterparty made "advance" payments to Longfin, nor was Longfin the beneficiary of a letter of credit issued by a buyer. In fact, none of the 2017 commodity transactions involved a letter of credit or referenced a letter of credit.

80. On May 21, 2018, Longfin filed a quarterly report on Form 10-Q for the quarter ended March 31, 2018. Meenavalli signed the Form 10-Q. In the filing, Longfin fraudulently reported revenue of $4.85 million from three fictitious contracts for zinc and ore dated in January 2018. Longfin and Meenavalli forged Y.P.'s signature on the fictitious contracts. Meenavalli knew or recklessly disregarded that Longfin's revenue for the quarter ended March 31, 2018 was materially overstated.

*Longfin Terminates Operations*

81. On November 14, 2018, Longfin filed a notice on Form 12b-25 with the SEC stating that it undertook the responsibility to file its quarterly report on Form 10-Q for the quarter ended September 30, 2018 within five days of the original due date. Longfin did not file the Form 10-Q within five days of the due date, nor at any time since the filing of this Complaint.

82. In the Form 12b-25, Longfin stated that it did not anticipate "any significant change in results of operations from the corresponding period for the last fiscal year." As Meenavalli knew or recklessly disregarded, this statement was false. In fact, two days earlier, Meenavalli had assigned the company's assets for liquidation pursuant to an assignment for the benefit of creditors under New Jersey state law. In the New Jersey state court proceeding, Longfin claimed that its "liabilities exceeded its assets and its current cash flow was insufficient to meet the obligations of the Company and its subsidiaries."

83. On November 21, 2018, in a current report on Form 8-K signed by Meenavalli, Longfin disclosed that its board of directors had determined to cease operations and to provide for an orderly liquidation of Longfin's assets. Longfin filed the assignment with the Monmouth County Clerk in Freehold, New Jersey. Longfin stated that, as of the filing of the Form 8-K, its liabilities exceeded its assets, its current cash flow was insufficient to meet its obligations, and the company expected no recovery for shareholders from the state court proceeding.

## FIRST CLAIM FOR RELIEF

### Fraudulent NASDAQ Listing Scheme in Violation of
### Securities Act Section 17(a) [15 U.S.C. § 77q(a)]
### (Defendants Longfin and Meenavalli)

84. The Commission realleges and reincorporates paragraphs 1 through 63 and 81 through 83 as if fully set forth herein.

85. Defendants, with scienter, by use of the means or instruments of transportation or communication in interstate commerce or by use the mails, in the offer or sale of securities, directly or indirectly:

    (a) employed devices, schemes, or artifices to defraud;

    (b) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c) engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

86. By reason of their actions alleged herein, Defendants violated Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*] and unless restrained and enjoined will continue to do so.

## SECOND CLAIM FOR RELIEF

### Fraudulent NASDAQ Listing Scheme in Violation of
### Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]
### (Defendants Longfin and Meenavalli)

87.     The Commission realleges and reincorporates paragraphs 1 through 63 and 81 through 83 as if fully set forth herein.

88.     Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails or of any facility of any national securities exchange, in connection with the purchase or sale of securities, directly or indirectly:

   (a)     employed devices, schemes, or artifices to defraud;

   (b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   (c)     engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit.

89.     By reason of their actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and, unless restrained and enjoined, will continue to do so.

### THIRD CLAIM FOR RELIEF

### Accounting Fraud in Violation of
### Securities Act Section 17(a) [15 U.S.C. § 77q(a)]
### (Defendants Longfin and Meenavalli)

90.     The Commission realleges and reincorporates paragraphs 1 through 83 as if fully set forth herein.

91.     Defendants, with scienter, by use of the means or instruments of transportation or communication in interstate commerce or by use the mails, in the offer or sale of securities, directly or indirectly:

(a)     employed devices, schemes, or artifices to defraud;

(b)     obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

92.     By reason of their actions alleged herein, Defendants violated Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*] and, unless restrained and enjoined, will continue to do so.

**FOURTH CLAIM FOR RELIEF**

**Accounting Fraud in Violation of
Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]
(Defendants Longfin and Meenavalli)**

93.     The Commission realleges and reincorporates paragraphs 1 through 83 as if fully set forth herein.

94.     Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails or of any facility of any national securities exchange, in connection with the purchase or sale of securities, directly or indirectly:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit.

95. By reason of their actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and, unless restrained and enjoined, will continue to do so.

## FIFTH CLAIM FOR RELIEF

### Filing False Reports in Violation of
### Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13
### [15 U.S.C. § 77q(a), 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13]
### (Defendants Longfin and Meenavalli)

96. The Commission realleges and reincorporates paragraphs 1 through 83 as if fully set forth herein.

97. As alleged above, Longfin filed false annual, quarterly, and periodic reports on Forms 10-K, 10-Q, and 8-K, respectively.

98. Longfin therefore violated and, unless restrained and enjoined, will continue to violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

99. Meenavalli aided and abetted Longfin's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13] by knowingly or recklessly providing substantial assistance to those violations.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Meenavalli is therefore liable for Longfin's violations.

100. Unless restrained and enjoined, Meenavalli will continue to aid and abet violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

## SIXTH CLAIM FOR RELIEF

**Failing to Maintain Accounting Records and Internal Controls in Violation of
Exchange Act Section 13(b)(2)(A) and(B) [15 U.S.C. § 78m(b)(2)(A)-(B)]
(Defendants Longfin and Meenavalli)**

101.     The Commission realleges and reincorporates paragraphs 1 through 83 as if fully set forth herein.

102.     As discussed above, Longfin (a) failed to make and keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of assets; and (b) failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were executed in accordance with management's general or specific authorization; transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

103.     Longfin therefore violated and, unless restrained and enjoined, will continue to violate Section 13(a)(2)(A) and (B) of the Exchange Act.

104.     Meenavalli aided and abetted Longfin's violations of Section 13(a)(2)(A) and (B) of the Exchange Act by knowingly or recklessly providing substantial assistance to those violations. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Meenavalli is therefore liable for Longfin's violations.

105.     Unless restrained and enjoined, Meenavalli will continue to aid and abet violations of Section 13(a)(2)(A) and (B) of the Exchange Act.

## SEVENTH CLAIM FOR RELIEF

### Circumvention of Internal Controls and Falsification of Accounting Records
### in Violation of Exchange Act Section 13(b)(5) and Rule 13b2-1
### [15 U.S.C. § 78m(b)(5); 17 C.F.R. § 240.13b2-1]
### (Defendant Meenavalli)

106. The Commission realleges and reincorporates paragraphs 1 through 83 as if fully set forth herein.

107. Meenavalli knowingly circumvented a system of internal accounting controls or knowingly falsified books, records, or accounts that Longfin was required to maintain under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

108. Meenavalli, acting knowingly, recklessly, or negligently, falsified or caused to be falsified books, records, or accounts that Longfin was required to maintain under Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

109. Meenavalli therefore violated and, unless restrained and enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## EIGHTH CLAIM FOR RELIEF

### False Certifications in Violation of
### Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]
### (Defendant Meenavalli)

110. The Commission realleges and reincorporates paragraphs 1 through 83 as if fully set forth herein.

111. Defendant Meenavalli, acting knowingly, recklessly, or negligently, signed the certifications included with Longfin's Form 10-K for the year ended December 31, 2017 and its Form 10-Q for the quarter ended March 31, 2018 falsely stating, among other things, that the forms

fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company.

112.    Meenavalli therefore violated and. unless restrained and enjoined, will continue to violate Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

## NINTH CLAIM FOR RELIEF

### Violation of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]
### Lying to Accountants
### (Defendant Meenavalli)

113.    The Commission realleges and reincorporates paragraphs 1 through 83 as if fully set forth herein.

114.    Meenavalli, directly or indirectly: (a) made or caused to be made materially false or misleading statements to an accountants; or (b) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (1) an audit, review, or examination of financial statements required by the Exchange Act or rules thereunder; or (2) the preparation or filing of a document or report required to be filed with the Commission.

115.    By engaging in the conduct described above and acting knowingly, recklessly, or negligently, Meenavalli violated and, unless restrained and enjoined, will continue to violate, Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectively requests that the Court:

(i)    Permanently enjoin Longfin from violating (*a*) Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(a)(2)(A)-(B)]

and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R.

§§ 240.12b-20, 240.13a-1, 240.13a-11]; and (*b*) Section 17(a) of the Securities Act;

(ii)    Permanently enjoin Meenavalli from (*a*) violating Sections 10(b) and

13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Exchange Act Rules 10b-5,

13a-14, 13b2-1, and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1,

240.13b2-2]; (*b*) violating Section 17(a) of the Securities Act; and (*c*) aiding and abetting violations

of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)-

(B)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20,

240.13a-1, 240.13a-11, 240.13a-13];

(iii)    Order Longfin and Meenavalli to pay civil penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C.

§ 78u(d)] in amounts to be determined by the Court;

(iv)    Order that Meenavalli be barred from acting as an officer or director of any

issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act

[15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act

[15 U.S.C. § 78o(d)];

(v)    Order the Defendants to disgorge, with prejudgment interest, all of the ill-

gotten gains derived from misconduct described in this Complaint;

(vi)    Order, pursuant to Rule 4(f)(3) of the Federal Rules of Civil Procedure,

directing service of the summons and complaint upon Defendants by any internationally agreed

means of service that is reasonably calculated to give notice, such as those authorized by the

Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, or by any

other means of alternative service not prohibited by international agreement; and

(vii)    Order such other relief as this Court may deem just and proper.


Respectfully submitted,

Dated: June 5, 2019               s/ Adam B.Gottlieb
                                   Adam B. Gottlieb
                                   Tel:  (202) 551-8299
                                   Stephan S. Schlegelmilch (*pending pro hac vice*)
                                   Tel:  (202) 551-4935
                                   SECURITIES AND EXCHANGE COMMISSION
                                   100 F Street, NE
                                   Washington, DC  20549
                                   Facsimile:  (202) 772-9282

Of counsel:
Anita Bandy
Ernesto Amparo
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549