**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
                                                  :

**SECURITIES AND EXCHANGE COMMISSION,**     :

                                                  :

                         **Plaintiff,**     :

               – against –     :      **19-CV-5296 (DLC)**

                                                    :

**LONGFIN CORP., and**
**VENKATA S. MEENAVALLI,**     :

                                                  :

                        **Defendants.**     :

                                                    :
------------------------------------------------------------------------x

## DECLARATION OF ERNESTO G. AMPARO

I, Ernesto G. Amparo, make this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.      I am an attorney in the Division of Enforcement ("Enforcement") of the U.S. Securities and Exchange Commission (the "Commission") in Washington, D.C.  I make this declaration based upon my personal knowledge, which includes information learned as one of the primary investigators in the Commission investigation styled, *In the Matter of Longfin Corp., SEC File No. HO-13445.*  This investigation resulted in the civil action styled, *Securities and Exchange Commission v. Longfin Corp. and Venkata S. Meenavalli*, filed on June 5, 2019 in the United States District Court for the Southern District of New York.

2.      This declaration sets forth the evidentiary record and the basis for the Commission's determination of the net proceeds Longfin Corp. ("Longfin") received in its 2017 public offering of its securities.

3.      On June 16, 2017, Longfin Corp.  ("Longfin") received initial qualification from the Commission for its public offering of up to 10 million shares of its common stock, at $5 per share, pursuant to exemption of Regulation A (the "Longfin Stock Offering").  A copy of this notice is attached hereto as EXHIBIT A.

### LONGFIN'S STOCK OFFERING
### NOT INVOLVING AN UNDERWRITER

4.      On July 7, 2017, Longfin Corp. ("Longfin") filed with the Commission its Post-Qualification Offering Circular Amendment No. 1, which constituted Longfin's offering document, effective as of the filing date. EXHIBIT B is an excerpt of this filing, which shows that the offering circular directed that, "All subscribers will be instructed by the company or its agents to transfer funds by wire or ACH transfer directly to an escrow account to be established for this offering or deliver checks made payable to escrow agent."

5.      On July 24, 2017, Longfin entered into an escrow agreement appointing Colonial Stock Transfer Company ("Colonial") as its escrow agent.  A copy is attached hereto as EXHIBIT C.  This escrow agreement provided for the establishment of an escrow account at Key Bank and, on July 26, 2017, Colonial opened at Key Bank the account, entitled, "Colonial Stock Transfer Co. Inc. Escrow #10 (the "Colonial Escrow Account") established to receive subscriber funds for the Longfin Stock Offering.  A copy of the opening documentation of the Colonial Escrow Account is attached hereto as EXHIBIT D.

6.      Beginning August 1, 2017, the Colonial Escrow Account began receiving wire deposits from subscribers to the Longfin Stock Offering.  Between August 1, 2017 and November 30, 2017, the Colonial Escrow Account posted a total of $338,335 in funds received from subscribers in the Longfin Stock Offering.  A copy of the monthly statements of the

Colonial Escrow Account for the period July 24, 2017 through December 31, 2017 are attached hereto as EXHIBIT E.

7.      On September 1, 2017, at Longfin's direction, its transfer agent issued 31,775 shares of its Class A common stock to 36 subscribers in the Longfin Stock Offering (the "First Offering Closing").  A copy of the transfer agent's control log for Longfin's Class A common stock, as of December 21, 2017, showing the foregoing share issuances, is attached hereto as EXHIBIT F.

8.      On September 5, 2017, the Colonial Escrow Account remitted $159,115 to Longfin's TD Bank account no. XXX-XXX1598.  This amount constituted net offering proceeds to Longfin. This remittance is evidenced in EXHIBIT E by the withdrawal on this date of this amount from the Colonial Escrow Account and its deposit on same date into Longfin's TD Bank account no. XXX-XXX1598, as shown in EXHIBIT G, attached hereto, which is a copy of the monthly statements of Longfin's TD Bank account no. XXX-XXX1598 for the period September 1, 2017 through December 31, 2017.

9.      On October 16, 2017, at Longfin's direction, its transfer agent issued 33,050 shares of its Class A common stock to 211 subscribers in the Longfin Stock Offering (the "Second Offering Closing").  These share issuances as shown on EXHIBIT F.

10.      On October 16, 2017, the Colonial Escrow Account remitted $164,750 to Longfin's TD Bank account no. XXX-XXX1598.  This amount constituted net offering proceeds to Longfin. This remittance is evidenced in EXHIBIT E by the withdrawal on this date of this amount from the Colonial Escrow Account and its deposit on same date into Longfin's TD Bank account as shown in EXHIBIT G.

11.     On November 30, 2017, at Longfin's direction, its transfer agent issued 2,900 shares of its Class A common stock to 12 subscribers in the Longfin Stock Offering (the "Third Offering Closing").  EXHIBIT F.

12.     On December 1, 2017, the Colonial Escrow Account remitted $12,125 to Longfin's TD Bank account XXX-XXX1598.  This amount constituted net offering proceeds to Longfin.  This remittance is evidenced in EXHIBIT E by the withdrawal on this date of this amount from the Colonial Escrow Account and its deposit on same date into Longfin's TD Bank account as shown in EXHIBIT G.

13.     Altogether, Longfin received $335,990 in net proceeds from the Colonial Escrow Account from a total of 67,725 Longfin Class A common shares sold and issued in the First Offering Closing, Second Offering Closing and Third Offering Closing.  These offerings did not involve an underwriter.

**LONGFIN'S STOCK OFFERING<br>THROUGH UNDERWRITER NETWORK 1**

14.     On July 19, 2017, Longfin filed with the Commission its Amendment No. 2 Post-Qualification Offering Circular. Attached hereto as EXHIBIT H is an excerpt of the filing disclosing Longfin's engagement of Network 1 as its lead underwriter for its public offering of securities.

15.     On September 13, 2017, Longfin and its underwriter, Network 1, entered into an escrow agreement with Continental Stock Transfer & Trust Company ("Continental") as the escrow agent for the offering of Longfin securities through an underwriter.  EXHIBIT I, attached hereto, is a copy of this escrow agreement.  Subsequently, Continental established an escrow

4

bank account (the "Continental Escrow Account") to receive funds from subscribers of Longfin's stock offering through underwriter Newtwork 1.

16.     On October 10, 2017, Longfin received its second qualification from the Commission for the offering of its shares to the public pursuant to exemption of Regulation A. EXHIBIT J.  This qualification was based on Longfin's Post-Qualification Offering Circular Amendment No. 7, filed on October 4, 2017.  An excerpt of this filing, attached hereto as EXHIBIT K, shows that it disclosed the public offering of Longfin's securities through underwriter, Network 1, and provided for the payment of shares subscribed through the underwriter to be made to the Continental Escrow Account.

17.     On November 22, 2017, Longfin received its third and final qualification from the Commission for the offering of its shares to the public pursuant to exemption of Regulation A.  .  A copy of the qualification notice is attached hereto as EXHIBIT L.  This qualification was based on Longfin's Post-Qualification Offering Circular Amendment No. 9, filed on November 3, 2017.  An excerpt of this filing, attached hereto as EXHIBIT M, shows that it disclosed the public offering of Longfin's securities through underwriter, Network 1, and provided for the payment of shares subscribed through the underwriter to be made to the Continental Escrow Account.

18.     Based on information, between November 7, 2017 and December 8, 2017, the Continental Escrow Account received a total of $3,319,520 in subscriber funds, constituting the gross proceeds for 663,904 shares of Longfin Class A common stock sold in the Network 1 underwriting.  EXHIBIT N, attached hereto, is a copy of the record of wire transfer transactions

of the Continental Escrow Account.  EXHIBIT N (lines 25 to 125) shows the foregoing receipt

of subscriber funds by the Continental Escrow Account.

19.     On December 8, 2017, Longfin closed the public offering of its securities.

20.     On December 8, 2017, Continental remitted $2,907,623.20 to Longfin's TD Bank

account no. XXX-XXX2658.  Based on information, this amount constituted net proceeds of

Longfin Class A common stock sold in the offering through underwriter Network 1.  EXHIBIT

N (line 126) shows the withdrawal of the foregoing amount from the Continental Escrow

Account and the deposit of the same amount to Longfin's TD Bank account no. XXX-XXX2658,

as shown in EXHIBIT O, attached hereto.  EXHIBIT O is the December 2017 account statement

for TD Bank account no. XXX-XXX2658.

21.     On December 11, 2017, at Longfin's direction, its transfer agent issued 663,904

shares of its Class A common stock to Network 1 as the "street name" holder of the securities for

the benefit of subscribers who acquired the Longfin shares through Network 1.  This share

issuance is shown in EXHIBIT F.

## TOTAL RECEIVED BY LONGFIN FROM
## THE PUBLIC OFFERING OF ITS SECURITIES

**22.**     Based on the foregoing, Longfin received a total of $3,243,613 (rounded to

nearest dollar) from 731,629 Class A common stock it sold and issued in the public offering of

its securities beginning June 16, 2017 (initial qualification date) and ending on December 8,

2017 (offering closing date.).

## PREJUDGMENT INTEREST

23.     The prejudgment interest on $3,243,613, based on an interest accrual period

beginning January 1, 2018 (accrual begins on the first of the month following the violation start

date of December 8, 2017) and ending on August 31, 2019 (accrual ends on the last day of the

month preceding the date of payment or judgment), is $288,622. This calculation is set forth in

EXHIBIT P.  If a judgment is entered in October 2019, the prejudgment interest is $303,016.

This calculation is set forth in EXHIBIT Q.  These calculations are based on the Commission's

methodology, which applies the interest rates used by the Internal Revenue Service to calculate

underpayment penalties and compounds interest on a quarterly basis.  I have rounded the

prejudgment interest amounts to the nearest dollar.

I declare under penalty of perjury that, based on my personal knowledge, information and

belief, the foregoing is true and correct.

Dated: 4 th of September, 2019
In Washington, D.C.


_____
Ernesto G. Amparo
Declarant

# EXHIBIT A

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## Notice of Qualification

**Date Qualified:**     June 16, 2017 2:00 P.M.
**Form:**              1-A

---

**CIK:**            0001699683
**Company Name:**   Longfin Corp
**File Number:**    024-10684

# EXHIBIT B

PART II AND III 2 longfin1_a_pos.htm FORM 1-A

**EXPLANATORY NOTE**

This Post-Qualification Offering Circular Amendment No 1 amends the offering circular of Longfin Corp  as qualified on June 16, 2017, and as may be amended and supplemented from time to time (the "offering circular"), to add, update and/or replace information contained in the offering circular

Post-Qualification Offering Circular
Amendment No.1
File No. 024-10684



**Longfin Corp.**

Up to 10,000,000 Class A Common Shares
Minimum purchase: 100 Class A Common Share ($500)

We are offering up to 10,000,000 Class A common shares on a "best efforts" basis  Since there is no minimum amount of securities that must be purchased, all investor funds will be available to the company upon commencement of this Offering and no investor funds will be returned if an insufficient number of shares are sold to cover the expenses of this Offering and provide net proceeds to the company

Generally, no sale may be made to you in this Offering if the aggregate purchase price you pay is more than 10% of the greater of your annual income or net worth. Different rules apply to accredited investors and non-natural persons. Before making any representation that your investment does not exceed applicable thresholds, we encourage you to review Rule 251(d)(2)(i)(C) of Regulation A. For general information on investing, we encourage you to refer to www.investor.gov

Sale of these shares has not commenced as of July 6th, 2017  and will commence within two calendar days post submission of this Post-Qualification Offering Circular, and it will be a continuous Offering pursuant to Rule 251(d)(3)(i)(F)  There is currently no trading market for our common stock

These are speculative securities. Investing in our shares involves significant risks. You should purchase these securities only if you can afford a complete loss of your investment. See "Risk Factors" beginning on page 4.

| | Number of Shares | | Price to Public | | Underwriting discount and commissions (1) | | Proceeds to issuer (2) | | Proceeds to other persons |
|---|---|---|---|---|---|---|---|---|---|
| Per Class A share | 1 | $ | 5 00 | $ | 0 00 | $ | 5 00 | $ | 0 00 |
| Total Maximum | 10,000,000 | $ | 50,000,000 | $ | 0 00 | $ | 50,000,000 | $ | 0 00 |

(1)     We are not currently using commissioned sales agents or underwriters

**THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING CIRCULAR OR OTHER SOLICITATION MATERIALS. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED ARE EXEMPT FROM REGISTRATION.**

The Offering will terminate at the earlier of: (1) the date at which the maximum offering amount has been subscribed, (2) the date which is one year from this Offering Statement being qualified by the Commission, or (3) the date at which the Offering is earlier terminated by the company in its sole discretion

We are following the "Offering Circular" format of disclosure under Regulation A

**16-017, 85 Broad Street, New York NY 10004**

**The date of this Offering Circular is July 6th, 2017**

2

4    PLAN OF DISTRIBUTION AND SELLING SECURITY HOLDERS

We are offering a maximum of 10,000,000 Class A Common Shares on a "best efforts" basis  All subscribers will be instructed by the company or its agents to transfer funds by wire or ACH transfer directly to an escrow account to be established for this offering or deliver checks made payable to escrow agent

The Offering will terminate at the earlier of: (1) the date at which the maximum offering amount has been subscribed, (2) the date which is one year from this Offering Statement being qualified by the Commission, or (3) the date at which the Offering is earlier terminated by the company in its sole discretion

The Offering Statement has been qualified by the Securities and Exchange Commission on June 16th, 2017; the company shall accept tenders of funds to purchase the shares  The company may close on investments on a "rolling" basis (so not all investors will receive their shares on the same date)  The funds tendered by potential investors will be transferred directly to the Company  Each time the company accepts funds directly from the investors is defined as a "Closing"  The company has engaged Colonial Stock Transfer Company, Inc , as the transfer agent

We are not currently selling the shares through commissioned sales agents or underwriters; however the company reserves the right to enter into an underwriting agreement when it's suitable  We will use our platform and third party platforms, to provide notification of the Offering  Persons who desire information may be directed to a website owned and operated by an unaffiliated third party that provides technology support to issuers engaging in Regulation A offerings

We are using our website as platform to provide the information about our Qualified Offering at www.longfincorp.com, and we are considering engaging third-party platforms in the near future

The company has entered into an agreement with Mr  Andy Altahawi/Adamson Brothers Corp for the provision of filing Reg A + Tier 2 and structuring for which Adamson Brothers will charge 3% of the issued shares post acquisition to be executed on a later date  Mr  Altahawi became an affiliated with the company and he is being considered to be part of our management team

You will be required to complete a subscription agreement in order to invest  The subscription agreement includes a representation by the investor to the effect that, if you are not an "accredited investor" as defined under securities law, you are investing an amount that does not exceed the greatest of 10% of your annual income or 10% of your net worth (excluding your principal residence)

20

# EXHIBIT C

## ESCROW AGREEMENT

This Escrow Agreement (this "Agreement") is made and entered into as of this 24th day of July 2017 by and between Longfin Corp a Delaware corporation, having an address at 16-017, 85 Broad Street, New York, NY 10004 (the "Issuer") and Colonial Stock Transfer Company, Inc. having offices at 66 Exchange Place, Suite 100, Salt Lake City, Utah 84111 (the "Escrow Agent" or "Colonial").

## RECITALS

WHEREAS, Issuer proposes to offer for sale to investors as disclosed in its offering materials, as disclosed in its offering statement on Form 1-A (the "Offering Statement"), securities pursuant to Regulation A+ promulgated by the U.S. Securities and Exchange Commission ("SEC") as modified by final rules adopted per Title IV of the Jumpstart Our Business Startups (JOBs) Act the equity securities of Issuer (the "Securities")  there is no minimum amount required to be raised according to the company's SEC June 16th qualification (the "Minimum Amount of the Offering") and up to $50 million (the "Maximum Amount of the Offering").

WHEREAS, the Company represents and warrants to the Escrow Agent that it has not stated to any individual or entity that the Escrow Agent's duties will include anything other than those duties stated in this Agreement; and

WHEREAS, Issuer desires to establish an Escrow Account in which funds received from prospective investors ("Subscribers") will be held during the Offering, subject to the terms and conditions of this Agreement. Colonial agrees to serve as Escrow Agent ("Escrow Agent") for the Subscribers with respect to such Escrow Account in accordance with the terms and conditions set forth herein. This includes, without limitation, that the Escrow Account will be held at an FDIC member bank in a separately named (as defined below) account. For purposes of communications and directives, Escrow Agent shall be the sole administrator of the Escrow Account.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, it is hereby agreed as follows:

1. **Establishment of Escrow Account.** Prior to the date the SEC issues a qualification for the sale of the Securities pursuant to the Offering Statement (the "Qualification Date"), the Escrow Agent shall establish an account at the Bank, entitled "Colonial Stock Transfer as Agent for Longfin Corp. Escrow Account (the "Escrow Account"). The Escrow Account shall be a segregated, deposit account at the Bank.

2. **Escrow Period.** The Escrow Period shall begin with the commencement of the Offering and shall terminate in whole or in part upon the earlier to occur of the following:
   a. The date upon which subscription amounts for the Minimum Amount of the Offering required to be sold have been deposited and cleared in the Escrow Account. The Escrow Account shall remain open pending receipt of Securities to meet the Maximum Amount of the Offering; or
   b. 12 months from the qualification date (escrow expiration date); or

    c.  The date upon which subscription amounts for the Minimum Amount of the Offering required to be sold have been deposited and cleared in the Escrow Account. The Escrow Account shall remain open pending receipt of Securities to meet the Maximum Amount of the Offering; or

During the Escrow Period, the parties agree that (i) Escrow Account and escrowed funds will be held for the benefit of the Subscribers, and that (ii) the Issuer is entitled to any funds received into escrow, and that amounts deposited into the Escrow Account shall become the property of Issuer, or the Issuer can triggered closing of such funds at anytime. However after the sale of securities to Subscribers, the Issuer may elect to continue to leave funds in the Escrow Account in order to protect Subscribers as needed.

In addition, Issuer and Escrow Agent acknowledge that the total funds raised cannot exceed the Maximum Amount of the Offering permitted by the Offering Statement. Issuer represents that no funds have yet been raised for the Issuer.

3. **Deposits into the Escrow Account.** All Subscribers will be instructed by the Issuer and the Escrow Agent to transfer funds by wire or ACH directly into the Escrow Account pursuant to the following instructions:

> Key Bank
> c/o Colonial Stock Transfer
> 2299 Highland Drive, Salt Lake City, UT 84106
> ABA Number: TBD
> For Credit To: Colonial Stock Transfer Escrow Account
> Account Number: _____
> SWIFT CODE: KEYBUS33

Escrow Agent shall cause the Bank to process all Escrow Amounts for collection through the banking system and shall maintain an accounting of each deposit posted to its ledger, which also sets forth, among other things, each Subscriber's name and address, the quantity of Securities purchased, and the amount paid. All monies so deposited in the Escrow Account and which have cleared the banking system are hereinafter referred to as the "Escrow Amount." Escrow Agent shall promptly, concurrent with any new or modified subscription, provide Issuer with a copy of the Subscriber's signed subscription agreement and other information as may be reasonably requested by Issuer in connection with the performance of its duties under this Agreement. As required by government regulations pertaining to the US Treasury, Homeland Security, the Internal Revenue Service ("IRS") and the SEC, federal law requires financial institutions to obtain, reasonably verify and record information that identifies each person (natural person or legal entity, including its authorized persons) who funds and executes securities transactions. Information requested of the Issuer and Subscribers will be typical information requested in the gathering and verification guidelines and best practices promulgated by anti-money laundering ("AML") rules and regulations and those regulatory agencies that enforce them. Escrow Agent is under no duty or responsibility to enforce collection of any wire, check or ACH delivered to it hereunder.

If any Subscription Agreement for the purchase of Securities is rejected by the Company in its sole discretion, then the Subscription Agreement and the Escrow Amount for such Subscriber shall be returned to the rejected Subscriber by the Escrow Agent within ten days from the date of rejection by the Company.

Escrow Agent reserves the right to deny, suspend or terminate participation in the Escrow Account of any Subscriber to the extent Escrow Agent deems it advisable or necessary to comply with applicable laws or to eliminate practices that are not consistent with securities industry laws, rules, regulations or best practices. Escrow Agent may at any time reject or return funds to any Subscriber (i) that do not clear background checks (anti-money laundering, USA PATRIOT Act, social security number issues, etc.) to the satisfaction of Escrow Agent ("OFAC Check"), in its sole and absolute discretion, or, (ii) for which Escrow Agent determines, in its sole discretion, that it would be improper or unlawful for Escrow Agent to accept or hold the applicable Subscriber's funds, as Escrow Agent, due to, among other possible issues, issues with the Subscriber or the source of the Subscriber's funds. Escrow Agent shall promptly inform Issuer of any such return or rejection.

4. **Disbursements from the Escrow Account.** There is no Minimum Amount required of this Offering prior to the termination of the Escrow Period, The company can withdraw funds as it pleases from the escrow account during the period, so long as the investor has passed the OFAC Check. In the event Escrow Agent receives cleared funds of the Offering prior to the termination of the Escrow Period and Escrow Agent receives a written instruction from Issuer, Escrow Agent shall, pursuant to those instructions, pay such Escrow Amount for all accepted subscriptions pursuant to the instructions of Issuer, but subject to Escrow Agent's rights concerning Return Period funds (defined as the time period the Subscriber has to seek a return of funds, or to seek to avoid liability for the funds by claiming the transaction was unauthorized) (First Closing). After the First Closing, with respect to any additional collected funds received from Subscribers and held by Escrow Agent prior to the termination date, Escrow Agent shall, upon receipt of written instructions from Issuer, including identifying additional participating Subscribers and the corresponding Escrow Amount, pay such Escrow Amount specified in the written instructions, but subject to Escrow Agent's rights concerning Return Period funds (discussed above).

The Escrow Agent shall not be required to pay any uncollected funds or any funds which are not available for withdrawal. All parties agree that funds are considered "cleared" as follows:
   1. Wires — 24 hours after receipt of funds
   2. Checks — 10 days after deposit
   3. ACH — As transactions must clear in a manner similar to checks, and as Federal regulations provide Subscribers with 60 days to recall funds, for risk reduction and protection, the Escrow Agent will agree to release, starting 10 calendar days after receipt and so long as the offering is closed, the greater of 94% of funds or gross funds less ACH deposits still at risk of recall. Of course, regardless of this operating policy, Issuer remains liable to immediately and without protestation or delay return to Escrow Agent any funds recalled pursuant to Federal regulations. Notwithstanding this procedure for

releasing ACH funds, all funds received via ACH that have been held 3 days will count toward the Minimum Offering Amount.

Issuer acknowledges that there is a 3 business day processing time once a request has been received to break Escrow or otherwise move funds. This is to accommodate the time needed to compare the request to the offering documents, to ensure AML has been completed, and to prepare funds for disbursement.

Issuer hereby irrevocably authorizes Escrow Agent to deduct broker fees and other funds for management and offering and selling expenses from the gross proceeds of the Escrow Account prior to remitting such funds, if and when due, to Issuer. Escrow Agent is hereby directed to remit such funds directly to the broker(s) and other parties, if any, to which they are due. Net proceeds (meaning gross proceeds less amounts remitted to brokers and other parties, and interest earned or accumulated in the Escrow Account) will then be remitted to Issuer as described above.

5. **Collection Procedure.** Any Subscriber funds which fail to clear or are subsequently reversed, including but not limited to ACH chargebacks and wire recalls, shall be debited to the Escrow Account, with such debits reflected on the Escrow ledger. Any and all fees paid by Issuer for funds receipt and processing are non-refundable, regardless of whether ultimately cleared, failed, rescinded, returned or recalled. In the event of any Subscriber refunds, returns or recalls after funds have already been remitted to Issuer then Issuer hereby irrevocably agrees to immediately and without delay or dispute send equivalent funds to Escrow Agent to cover the refund, return or recall. If Issuer has any dispute or disagreement with its Subscriber then that is separate and apart from this Agreement and Issuer will address such situation directly with said Subscriber, including taking whatever actions Issuer determines appropriate, but Issuer shall regardless remit funds to Escrow Agent and not involve Escrow Agent in any such disputes.

6. **Investment of Escrow Amount.** Escrow Agent may, at its' discretion, invest any or all of the Escrow Account balance as permitted by banking regulations. No interest shall be paid to Issuer or Subscribers on the Escrow Account balance.

7. **Escrow Administration Fees, Compensation of Escrow Agent.** Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as Exhibit A, which compensation shall be paid by the Issuer.

8. **Representations and Warranties.** The Issuer covenants and makes the following representations and warranties to Escrow Agent:
   a. It is duly organized, validly existing, and in good standing under the laws of the state of its incorporation or organization, and has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.
   b. This Agreement has been duly approved by all necessary actions, including any necessary shareholder or membership approval, has been executed by its duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms.
   c. The execution, delivery, and performance of this Agreement is in accordance with the

agreements related to the Offering and will not violate, conflict with, or cause a default under its articles of incorporation, bylaws, management agreement or other organizational document, as applicable, any applicable law, rule or regulation, any court order or administrative ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture, or other binding arrangement, including the agreements related to the Offering, to which it is a party or any of its property is subject.

d.   The Offering shall contain a statement that Escrow Agent has not investigated the desirability or advisability of investment in the Securities nor approved, endorsed or passed upon the merits of purchasing the Securities; and the name of Escrow Agent has not and shall not be used in any manner in connection with the Offering of the Securities other than to state that Escrow Agent has agreed to serve as escrow agent for the limited purposes set forth in this Agreement.

e.   No party other than the parties hereto has, or shall have, any lien, claim or security interest in the Escrow Funds or any part thereof. No financing statement under the Uniform Commercial Code is on file in any jurisdiction claiming a security interest in or describing (whether specifically or generally) the Escrow Funds or any part thereof.

f.   It possesses such valid and current licenses, certificates, authorizations or permits issued by the appropriate state, federal or foreign regulatory agencies or bodies necessary to conduct its respective businesses, and it has not received any notice of proceedings relating to the revocation or modification of, or non-compliance with, any such license, certificate, authorization or permit.

g.   The Offering complies in all material respects with the Act and all applicable laws, rules and regulations.

All of its representations and warranties contained herein are true and complete as of the date hereof and will be true and complete at the time of any disbursement of Escrow Funds.

9.   **Term and Termination.** This Agreement will remain in full force during the Escrow Period and shall terminate upon the following:

a.   Termination for Convenience. Any party may terminate this Agreement at any time for any reason by giving at least thirty (30) days' written notice.

b.   Escrow Agent's Resignation. Escrow Agent may unilaterally resign by giving written notice to Issuer, whereupon Issuer will immediately appoint a successor escrow agent. Until a successor escrow agent accepts appointment or until another disposition of the subject matter has been agreed upon by the parties, following such resignation notice, Escrow Agent shall be discharged of all of its duties hereunder save to keep the subject matter whole.

c.   The Escrow Agent may at any time resign as such by delivering the Escrowed Property to any successor Escrow Agent designated by the Stockholders and the Company in writing, or to any court of competent jurisdiction, whereupon the Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Agreement.  The resignation of the Escrow Agent will take effect on the earlier of (a) the appointment of a successor (including a court of competent jurisdiction) or (b) the day that which is 30 days after the date of delivery of its written notice of resignation to the

Stockholders and the Company.  If at that time the Escrow Agent has not received a designation of a successor Escrow Agent, the Escrow Agent's sole responsibility after that time shall be to safe keep the Escrowed Property until receipt of a designation of successor Escrow Agent or a written disposition instruction by the Company or a final order of a court of competent jurisdiction.

Even after this Agreement is terminated, certain provisions will remain in effect, including but not limited to items 3, 4, 5, 10, 11, 12, 14, and 15 of this Agreement. Escrow Agent shall be compensated for the services rendered as of the date of the termination or removal.

10. **Applicable Law, Venue, and Attorney's Fees.** This Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Utah, as applicable, without regard to principles of conflict of laws, and each party submits to the personal jurisdiction, and waives all objections to venue for the enforcement of any provision of this Agreement, in the state and federal courts situated in Utah. Furthermore, the prevailing party shall be entitled to recover damages plus reasonable attorney's fees and costs.

11. **Limited Capacity of Escrow Agent.** This Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto, and no implied duties or obligations shall be read into this Agreement against Escrow Agent. Escrow Agent acts hereunder as an escrow agent only and is not associated, affiliated, or involved in the business decisions of Issuer or Subscriber. Escrow Agent is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness, or validity of the subject matter of this Agreement or any part thereof, or for the form of execution thereof, or for the identity or authority of any person executing or depositing such subject matter. Escrow Agent shall be under no duty to investigate or inquire as to the validity or accuracy of any document, agreement, instruction, or request furnished to it hereunder, including, without limitation, the authority or the identity of any signer thereof, believed by it to be genuine, and Escrow Agent may rely and act upon, and shall not be liable for acting or not acting upon, any such document, agreement, instruction, or request. Escrow Agent shall in no way be responsible for notifying, nor shall it be responsible to notify, any party thereto or any other party interested in this Agreement of any payment required or maturity occurring under this Agreement or under the terms of any instrument deposited herewith.

12. **Indemnity.** Issuer agrees to defend, indemnify and hold Escrow Agent and its respective related entities, directors, employees, service providers, advertisers, affiliates, officers, agents, and partners and third-party service providers harmless from any loss, liability, claim, or demand, including reasonable attorney's fees, made by any third party due to or arising out of this Agreement and/or arising from a breach of any provision in this Agreement. This indemnity shall also include, but is not limited to, all expenses incurred in conjunction with any interpleader that Escrow Agent may enter into regarding this Agreement and/or third-party subpoena or discovery process that may be directed to Escrow Agent. This defense and indemnification obligation will survive termination of this Agreement.

Escrow Agent reserves the right to control the defense of any such claim or action and all

negotiations for settlement or compromise, and to select or approve defense counsel, and Issuer agrees to fully cooperate with Escrow Agent in the defense of any such claim, action, settlement, or compromise negotiations.

13. **Entire Agreement, Severability and Force Majeure.** This Agreement contains the entire agreement between Issuer and Escrow Agent regarding the Escrow Account. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect. Furthermore, no party shall be responsible for any failure to perform due to acts beyond its reasonable control, including acts of God, terrorism, shortage of supply, labor difficulties (including strikes), war, civil unrest, fire, earthquake, floods, electrical outages, equipment or transmission failures, internet interruptions, vendor failures (including information technology providers), or other similar causes.

14. **Changes.** Escrow Agent may, at its sole discretion, comply with any new, changed, or reinterpreted regulatory or legal rules, laws or regulations, and any interpretations thereof, and without necessity of notice, to modify either this Agreement and/or the Escrow Account to comply or conform to such changes or interpretations. Escrow Agent will notify Issuer of material changes as soon as practicable. Furthermore, all parties agree that this Agreement shall continue in full force and be valid, unchanged and binding upon any successors of Escrow Agent. Changes to this Agreement will be sent to Issuer via email.

15. **Waivers.** No waiver by any party to this Agreement of any condition or breach of any provision of this Agreement will be effective unless in writing. No waiver by any party of any such condition or breach, in any one instance, will be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or breach of any other provision contained in this Agreement.

16. **Disputes Regarding Escrowed Property.** In the event of any disagreement resulting in adverse claims or demands being made in connection with the Escrowed Property, or in the event that the Escrow Agent in good faith is in doubt as to what action it should take hereunder, the Escrow Agent shall be entitled to retain the Escrowed Property until the Escrow Agent shall have received (i) a final non-appealable order of a court of competent jurisdiction directing delivery of the Escrowed Property or (ii) a written agreement executed by the parties to the dispute directing delivery of the Escrowed Property, in which event the Escrow Agent shall disburse the Escrowed Property in accordance with such order or agreement. Any court order shall be accompanied by a legal opinion by counsel for the presenting party satisfactory to the Escrow Agent to the effect that said opinion is final and non-appealable.

17. **Notices.**

   a.      Any communication in connection with this agreement must be in writing and, unless otherwise stated, may be given:

              ii)       in person, by post or fax; or

iii)      by e-mail or other electronic communication.

b. Such communications shall be addressed as follows:

**If to Escrow Agent:**

Ms. Kathy Carter

Colonial Stock Transfer Company, Inc.

66 Exchange Place, Suite 100

Salt Lake City, UT 84111

Phone:  (801) 355-5740

Fax:  (801) 355-6505

**If to the Issuer:**

Name: Ms Sarah A/ Mr Krishanu Singhal

Title: Vice President/ Chief Financial Officer

Company Name: Longfin Corp

Address: 16-017, 85 Broad Street, New York, NY 10004

City, State, Zip: New York, NY 10004

Phone: +65 97762035

Fax: _____

c.      Any party may change their notice or email address and/or facsimile number by giving written notice thereof in accordance with this Paragraph. All notices hereunder shall be deemed given: (1) if served in person, when served; (2) if sent by facsimile or email, on the date of transmission if before 6:00 p.m. Eastern time, provided that a hard copy of such notice is also sent by either a nationally recognized overnight courier or by U.S. Mail, first class; (3) if by overnight courier, by a nationally recognized courier which has a system of providing evidence of delivery, on the first business day after delivery to the courier; or (4) if by U.S. Mail, on the third day after deposit in the mail, postage prepaid, certified mail, return receipt requested.

18. **Electronic Signature and Communications Notice and Consent.** Digital ("electronic") signatures, often referred to as an "e-signature", enable paperless contracts and help speed up business transactions. The 2001 E-Sign Act was meant to ease the adoption of electronic

signatures. The mechanics of this Agreement's electronic signature include the parties signing this Agreement below by typing in the party's name, with the underlying software recording its IP address, browser identification, the timestamp, and a securities hash within an SSL encrypted environment. This electronically signed Agreement will be available to both Issuer and Escrow Agent, as well as any associated bankers, brokers and platforms so they can access and copy it at any time. Issuer and Escrow Agent hereby consent and agree that electronically signing this Agreement constitutes each party's signature, acceptance and agreement as if actually signed by each party in writing. Further, all parties agree that no certification authority or other third party verification is necessary to validate any electronic signature; and that the lack of such certification or third party verification will not in any way affect the enforceability of your signature or resulting contract between Issuer and Escrow Agent. The parties understand and agree that the e-signature executed in conjunction with the electronic submission of this Agreement shall be legally binding and such transaction shall be considered authorized by each party. The parties agree that their electronic signatures are the legal equivalent of their manual signatures on this Agreement consenting to be legally bound by this Agreement's terms and conditions. Furthermore, Issuer and Escrow Agent hereby agree that all current and future notices, confirmations and other communications regarding this Escrow Services Agreement specifically, and future communications in general between the parties, may be made by email, sent to the email address of record as set forth in Section 16 above, or as otherwise from time to time is changed or updated and disclosed to the other party, without necessity of confirmation of receipt, delivery or reading, and such form of electronic communication is sufficient for all matters regarding the relationship between the parties. If any such electronically sent communication fails to be received for any reason, including but not limited to such communications being diverted to the recipients spam filters by the recipients email service provider, or due to a recipients change of address, or due to technology issues by the recipient's service provider, the parties agree that the burden of such failure to receive is on the recipient and not the sender, and that the sender is under no obligation to resend communications via any other means, including but not limited to postal service or overnight courier, and that such communications shall for all purposes, including legal and regulatory, be deemed to have been delivered and received. No physical, paper documents will be sent to Issuer, and if Issuer desires physical documents, then Issuer agrees to be satisfied by directly and personally printing, at its own expense, the electronically sent communication(s) and maintaining such physical records in any manner or form that Issuer desires.

19. **Form W–9:** Issuer shall provide Escrow Agent with a completed IRS Form W-9 in order to facilitate the opening of the Escrow Account.

Agreed by the undersigned as of the date set forth above by and between:

Longfin Corp, as Issuer

**By**  _____

**Name**   Krishanu Singhal

**Title**   Chief Financial Officer


Colonial Stock Transfer Company, Inc.

**By**  _____

**Name**  _____

**Title**  _____

**EXHIBIT A**

**FEES**

Company will pay Colonial Stock Transfer the following:

- $2,500 - setup fee and closings.
- $10.00 - fee per incoming payment
- $25.00 - fee per outgoing payment
- $50.00 - lost check replacement fee
- Bank Service Fees will not be included in Escrow Agent Fees, but will be passed through at cost

* There may be other unforeseen special handling charges.  Colonial Stock Transfer will notify the company if any such charges are necessary.